**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 07-1570 (RCL) |
| | ) | |
| BUREAU OF LAND MANAGEMENT | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S VERIFIED MOTION FOR AN AWARD OF
ATTORNEY'S FEES AND LITIGATION EXPENSES**

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel and pursuant to 5 U.S.C. §

552(a)(4)(E) and 28 U.S.C. § 1920, respectfully requests that it be awarded $3,605.57 in

attorney's fees and litigation expenses in the above-captioned action.  The motion is supported by

a verified itemization of attorney/paralegal time and expenses.  As grounds therefor, Judicial

Watch states as follows:

**MEMORANDUM OF LAW**

I.    **Factual Background.**

This case involves Judicial Watch's efforts to obtain records relating to contacts and

communications between the Bureau of Land Management ("BLM") and certain high public

officials, as part of an investigation into whether improper political pressure affected agency

decision making.  Specifically, on March 8, 2007, Plaintiff sent FOIA requests to Defendant

BLM seeking access to the following records:

(1)    Contacts or communications between the Bureau of Land Management
and any of the following individuals and/or their offices or staffs
concerning or relating to any proposal to exchange public land in the

Coyote Springs Valley, Clark County, Nevada, for land owned by Coyote Springs Investment, LLC:

   a.     U.S. Senator Harry Reid;
   b.     U.S. Senator John Ensign; or
   c.     U.S. Rep. Jim Gibbons.

(2)   Contacts or communications between the Bureau of Land Management and any of the following individuals and/or their offices or staffs concerning or relating to the 2004 or 2005 agreement to exchange public land in the Coyote Springs Valley, Clark County, Nevada, for land owned by Coyote Springs Investment, LLC:

   a.     U.S. Senator Harry Reid;
   b.     U.S. Senator John Ensign; or
   c.     U.S. Rep. Jim Gibbons.

(3)   Contacts or communications between the Bureau of Land Management and any of the following individuals and/or their offices or staffs concerning or relating to the February 18, 2005 issuance of Patent No. 27-2005-0081 to Coyote Springs Investment, LLC:

   a.     U.S. Senator Harry Reid;
   b.     U.S. Senator John Ensign; or
   c.     U.S. Rep. Jim Gibbons.

Identical requests were sent to both the Washington, D.C. headquarters of Defendant BLM and Defendant BLM's Las Vegas Field Office.

Defendant BLM acknowledged receipt of Plaintiff's FOIA request to Defendant BLM's Washington, D.C. headquarters on March 9, 2007. Defendant BLM's Las Vegas Field Office subsequently advised Plaintiff that Defendant BLM's Washington, D.C. headquarters would be responding to Plaintiff's request to the Las Vegas Field Office as well.

Defendant BLM was required by 5 U.S.C. § 552(a)(6)(A)(i) to determine within twenty (20) business days, or on or about April 6, 2007, whether to comply with Plaintiff's FOIA requests and to immediately notify Plaintiff accordingly.

Nearly six months after Judicial Watch submitted its requests, Defendant BLM still had failed to produce responsive records or otherwise deny the existence of such records or assert such records are exempt from production under 5 U.S.C. § 552(b).  Judicial Watch then filed this lawsuit on September 5, 2007.

Subsequently, Defendant produced all responsive records it had located on or about September 20, 2007, with the exception of a single cell phone number withheld pursuant to FOIA Exemption 6.  On October 15, 2007, counsel for Judicial Watch and counsel for the agency conferred in an attempt to resolve this matter without further litigation.  During that conversation, Plaintiff's counsel expressed his concern regarding the adequacy of the search the agency conducted.  In response to these concerns, Defendant's counsel agreed to provide to Judicial Watch the declarations Defendant intended to filed in support of its anticipated summary judgment motion.  On October 31, 2007, Defendant's counsel provided Plaintiff's counsel with the declarations from agency officials.  Plaintiff's counsel subsequently communicated various concerns regarding the adequacy of the search to counsel for Defendant.  The agency then agreed to make a good faith effort to address these concerns regarding the adequacy of the search. Defendant's counsel then provided revised declarations addressing these concerns to Plaintiff's counsel on December 18, 2007.

Following a review of the agency's response, Plaintiff elected not to challenge the scope of the search or the assertion of FOIA Exemption 6.  On January 7, 2008, the parties submitted to the Court a Stipulation of Entry of Judgment to resolve this matter.

II.    **Argument**.

A.    **Judicial Watch is Entitled to an Award of Attorney's Fees.**

FOIA allows awards of attorney's fees to prevailing plaintiffs for two purposes:  (1) "to

encourage Freedom of Information Act suits that benefit the public interest" and (2) to serve "as

compensation for enduring an agency's unreasonable obduracy in refusing to comply with the

Freedom of Information Act's requirements."  *LaSalle Extension Univ. v. Federal Trade*

*Comm'n*, 627 F.2d 481, 484 (D.C. Cir. 1980).  To obtain an award, the requester must

demonstrate that (1) it has "substantially prevailed" and is thus eligible for an award; and (2) it is

entitled to an award under a balancing of relevant factors.  *See* 5 U.S.C. § 552(a)(4)(E)(providing

that "the court may assess against the United States reasonable attorney's fees and other litigation

costs reasonably incurred in any case under this section in which the complainant has

substantially prevailed.");  *see also Campaign for Responsible Transplantation v. Food & Drug*

*Admin.*, No. 06-5333, 2007 U.S. App. LEXIS 29857 (D.C. Cir. Dec. 28, 2007); *Oil, Chemical and*

*Atomic Workers Int'l Union v. Department of Energy*, 288 F.3d 452 (D.C. Cir. 2002); *Bricker v.*

*FBI*, 54 F. Supp. 2d 1, 5 (D.D.C. 1999); *Northwest Coalition for Alternatives to Pesticides v.*

*Browner*, 965 F. Supp. 59, 63 (D.D.C. 1997) (citing *Weisberg v. DOJ*, 848 F.2d 1265, 1268

(D.C. Cir. 1988)).

1.    **Judicial Watch Has "Substantially Prevailed" As Defined Under the**
      **Recent FOIA Amendments.**

The law governing the question of whether a FOIA requester has substantially prevailed

has recently been clarified.  On December 31, 2007, President George W. Bush signed into law

the Open Government Act of 2007.  The Act amends 5 U.S.C. § 552(a)(4)(E) to provide in

relevant part:

> (ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either–
>
>> (I) a judicial order, or an enforceable written agreement or consent decree; or
>>
>> (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

OPEN Government Act of 2007, Pub. L. No. 110-175, § 4(a)(2)(ii), 121 Stat. 2524 (2007) (copy

attached as Exhibit 1).  As explained below, Judicial Watch prevails under subsection (II) above.

In this case, Judicial Watch substantially prevailed as the agency voluntarily and

unilaterally changed its position regarding the release of responsive documents following the

initiation of this lawsuit.  Specifically, BLM failed to produce any documents in response to

Plaintiff's FOIA request for more than six months, and then only after Judicial Watch filed this

action as a result.  This action by the agency to produce the long-overdue documents plainly

constitutes a change in position by the agency.  The production of records constituted relief to

Judicial Watch and was in response to the "not insubstantial" claim against the agency set forth

in this lawsuit.  Consequently, Judicial Watch "substantially prevailed" and is eligible for an

award of attorney's fees and litigation expenses.

If, as Judicial Watch anticipates, Defendant BLM asserts that the revised FOIA law does

not "retroactively" apply to this case, such an argument would be misplaced.  In *Landgraf v. USI*

*Film Prods.*, 511 U.S. 244, 265 (1994), the U.S. Supreme Court clearly stated that a court should

generally apply the version of a statute, including any amendment, that is in effect at the time of

its decision.  511 U.S. at 273.  The only reason the Supreme Court held that the provisions at

issue in *Landgraf* could not be applied retroactively is because the compensatory and punitive

damage provisions at issue would attach new *substantive* legal burdens to past conduct. *Id.* at

284, 286.  Of critical importance here, however, the Court in *Landgraf* went on to state that

attorney's fees determinations are of a different kind then the compensatory and punitive damage

provisions.  The Court stated, "Attorney's fee determinations, we have observed, are 'collateral

to the main cause of action' and 'uniquely separable from the cause of action to be proved at

trial.'" *Id.* at 277 (quoting *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445,

451-452 (1982)).  As such, amendments to attorney's fees provisions generally may be

retroactively applied.  *Id.*; *see also Tax Analysts v. IRS*, No. 96-2285 (CKK), 2000 U.S. Dist.

LEXIS 5066, *8-9 (D.D.C. March 31, 2000) (holding that application of amended law to attorney

fee determination in FOIA case did not have impermissible retroactive effect as fee

determination was not a "substantive right or settled expectation under FOIA.").[1]

---

[1]     Extending the FOIA amendment to this case is not prevented by sovereign immunity, as the amendment did not create a new right to attorney's fees, but only clarified an existing statutory right, as testified to by the OPEN Government Act of 2007's sponsor Senator Patrick J. Leahy:

> The bill also addresses a relatively new concern that, under current law, Federal agencies have an incentive to delay compliance with FOIA requests until just before a court decision is made that is favorable to a FOIA requestor.  The Supreme Court's decision in Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U. S. 598, 2001, eliminated the "catalyst theory" for attorneys' fees recovery under certain federal civil rights laws.  When applied to FOIA cases, Buckhannon precludes FOIA requesters from ever being eligible to recover attorneys fees under circumstances where an agency provides the records requested in the litigation just prior to a court decision that would have been favorable to the FOIA requestor.  **The bill clarifies that Buckhannon does not apply to FOIA cases.**

153 Cong. Rec. S 15701, 15704 (daily ed. December 14, 2007) (statement by Sen. Leahy) (emphasis added).

Thus, the Court should apply FOIA as amended by the OPEN Government Act of 2007 to this case and find that Judicial Watch has substantially prevailed and is, therefore, eligible for an attorney fee award.

### 2.     Balancing the Relevant Factors Warrants an Award.

Before granting an award of attorney's fees and litigation expenses to a requester who has "substantially prevailed," a Court also must consider the following four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) whether the Government had a reasonable basis for withholding requested information." *Burka v. U.S. Dep't of Health & Human Servs.*, 142 F.3d 1286, 1288 (D.C. Cir. 1998) (internal citations and quotations omitted). The second and third factors are "closely related and often considered together." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (quoting *Tax Analysts v. United States Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992)). In determining a requester's entitlement to an award of attorney's fees, the Court must balance all four factors. *Ralph Hoar & Assocs. v. Nat'l Hwy Traffic Safety Admin.*, 985 F. Supp. 1, 9 (D.D.C. 1997). No single factor should be given dispositive weight. *Nationwide Bldg. Maintenance. Inc. v. Sampson*, 559 F.2d 704, 714 (D.C. 1977). The balancing of these factors in this case clearly supports awarding attorney's fees to Judicial Watch.

### a.     Public Benefit.

According to the D.C. Circuit, a FOIA action results in a public benefit if a plaintiff's victory is "likely to add to the fund of information that citizens may use in making vital political choices." *Cotton*, 63 F.3d at 1120 (quoting *Blue v. Bureau of Prisons*, 570 F.2d 529, 534 (5th Cir. 1978)). In making this inquiry, it is important to note that the "central purpose" of FOIA is

"to assist our citizenry in making the informed choices so vital to the maintenance of a popular form of government." *Blue*, 570 F.2d at 533.

The subject matter of this FOIA request involved the actions of high public officials, including the majority leader of the U.S. Senate, and the published reports regarding intervention with agency officials on behalf of a Nevada lobbyist and a large development project. *See* Exhibit 2 (Chuck Neubauer and Richard Cooper, "Desert Connections," *Los Angeles Times*, at C1 (August 20, 2006)). By investigating these allegations, Judicial Watch performed an important public service both by what it found, and also by what it did not find, regarding the allegations. As such, Judicial Watch clearly added to "the fund of information" available to citizens about the actions of their public officials. As such, this case conferred a substantial, educational benefit on the public.

This action also conferred a second, perhaps even more significant public benefit by vindicating a FOIA requester's rights under the law. Absent this lawsuit, it uncertain when, if ever, the agency would have complied with law and complied with Plaintiff's FOIA request. Without such effort by a FOIA requester, an agency would be able to continually flout the law with impunity. Helping ensure that an agency complies with the law thus constitutes another important public benefit.

        b.    **Commercial Benefit/Nature of Plaintiff's Interest.**

The second and third factors -- whether a plaintiff will derive commercial benefit from disclosure and the nature of the plaintiff's interests in the records -- are closely related and typically considered together. *Cotton*, 63 F.3d at 1120. Judicial Watch is a not-for-profit, tax-exempt, educational organization. It has no commercial interest in this case. Instead, Judicial

Watch's interest is in obtaining and disseminating information of interest to the public, which, significantly, is identical to the purpose behind FOIA.  S. Rep. No. 93-854, 93 Cong., 2d Sess. at 19 (1974).  Accordingly, Judicial Watch's entirely non-commercial motive and its interest in obtaining and disseminating the records at issue here clearly entitle it to an award of attorney's fees and expenses.

<strong>c.</strong>    <strong><u>Reasonableness of Government's Basis for Withholding</u></strong>.

This final criterion provides, in part, that where the government has unreasonably withheld records, a fee award is appropriate if the agency was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior."  *See Tax Analysts v. United States Dep't of Justice*, 965 F.2d 1092, 1097 (D.C. Cir. 1992) (citations omitted); *Cazalas v. United States Dep't of Justice*, 709 F.2d 1051, 1054 (5th Cir. 1983); *Matlack, Inc. v. United States Environmental Protection Agency*, 868 F. Supp. 627, 632 (D. Del. 1994).

Defendant BLM's conduct clearly justifies a fee award.  The agency failed to comply with FOIA's statutorily-mandated deadlines, leaving Judicial Watch with no alternative but to file a lawsuit to obtain the records at issue and to vindicate its statutory right to those records.  The agency has offered no legitimate explanation for its failure to produce records before Judicial Watch was forced to seek bring this lawsuit.  Under the circumstances, an award of attorney's fees and expenses clearly is more than amply justified.

<strong>3.</strong>    <strong><u>The Requested Award is Reasonable</u></strong>.

Fee awards are calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate, resulting in a lodestar amount.  *See Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980).  As public interest lawyers, Judicial Watch's attorneys do not have

-9-

customary billing rates, as most private practice attorneys do.  Nevertheless, public interest

attorneys may be awarded reasonable attorney's fees calculated "according to the prevailing

market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 896 (1984) (fees

awarded based on prevailing rate whether plaintiff is represented by private or nonprofit

counsel); *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995); *Save Our

Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1524 (D.C. Cir. 1988).

It is well established that awards of attorney's fees may be calculated based on the *Laffey*

Matrix, because, in the absence of a specific sub-market analysis of attorney's fees, "use of the

broad *Laffey* Matrix may be by default the most accurate evidence of a reasonable hourly rate."

*Covington*, 57 F.3d at 1114 n.5.[2]  A copy of the *Laffey* Matrix is attached as Exhibit 3.  Judicial

Watch requests that its fee award be calculated under the *Laffey* Matrix.

A verified itemization of attorney/paralegal time expended by Judicial Watch in this

matter is attached as Exhibit 4.  Unless otherwise indicated, the itemization was generated from

the contemporaneously-kept time records of the individuals who worked on the case:  Paul J.

Orfanedes, James F. Peterson, and David F. Rothstein.  The rates applied to the time recorded in

Exhibit 3 are adopted from the *Laffey* Matrix.

---

[2]     This matrix, commonly referred to as the "*Laffey* Matrix" or the "United States
Attorney's Office Matrix," is based on hourly rates allowed by the District Court in *Laffey v.
Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983).  Use of an updated *Laffey* Matrix was
implicitly endorsed by the U.S. Court of Appeals for the District of Columbia Circuit in *Save
Our Cumberland Mountains*, 57 F.2d at 1525.  The Court subsequently declared that parties may
rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of
prevailing market rates for litigation counsel in the Washington, D.C. area.  *See Covington v.
District of Columbia*, 57 F.3d 1101, 1105 & n.14 (D.C. Cir. 1995).

Mr. Orfanedes is an attorney who graduated from The American University's Washington College of Law in 1990.  He has been practicing law continuously since that time and is an experienced litigator and has been admitted to practice before numerous state and federal courts, including the Bar of this Court.

Mr. Peterson is an attorney who graduated from the George Mason University School of Law in 1993.  He has been practicing law continuously since 1994 in private practice and with nonprofit organizations.  He has practiced before numerous state and federal courts, including the Bar of this Court.

Mr. Rothstein is a senior litigation assistant/paralegal who graduated from The Catholic University of America's Columbus School of Law in 1994.  He has been working as a paralegal at Judicial Watch since 2003.

**B.      Judicial Watch is Entitled to Reimbursement for Its Litigation Expenses.**

Judicial Watch has incurred litigation expenses (other than fees of counsel) of $367.82. This consists of the $350.00 filing fee to initiate this action and $17.82 in postage for serving the complaint via certified U.S. mail.  *See* Exhibit 1.  As provided under FOIA and 28 U.S.C. § 1920, these expenses should be reimbursed to Judicial Watch.

**III.      Conclusion.**

For the foregoing reasons, Judicial Watch respectfully requests that it be awarded $3,237.75 in attorney's fees and $367.82 in litigation expenses pursuant to 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 1920, for a total award of $3,605.57.

Dated:  January 22, 2007                    Respectfully submitted,

                                            JUDICIAL WATCH, INC.


                                            s/ James F. Peterson
                                            D.C. Bar No. 450171
                                            501 School Street, S.W.
                                            Suite 500
                                            Washington, DC 20024
                                            (202) 646-5172

                                            *Attorneys for Plaintiff*

## <u>LOCAL RULE 7(M) CERTIFICATE</u>

On January 22, 2008, I contacted Tamra Moore, counsel for the Bureau of Land Management, to discuss the relief requested in this motion. Ms. Moore and I agreed that, after she and her client had an opportunity to review the motion and verified itemization, we would confer again to determine whether the motion could be resolved by agreement of the parties or if it needed to be litigated. We also agreed that, because it may take additional time in which to make this determination, with the Court's consent, Defendant could have until and including February 29, 2008 in which to submit any opposition, if necessary.

<u>/s/ James F. Peterson</u>

EXHIBIT 1

110 P.L. 175, *; 121 Stat. 2524;
2007 Enacted S. 2488; 110 Enacted S. 2488

5 of 100 DOCUMENTS

UNITED STATES PUBLIC LAWS
110th Congress -- 1st Session
(c) 2007, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER PROPERTIES INC.

PUBLIC LAW 110-175 [S. 2488]
DEC. 31, 2007
OPENNESS PROMOTES EFFECTIVENESS IN OUR NATIONAL GOVERNMENT ACT OF 2007

*110 P.L. 175; 121 Stat. 2524; 2007 Enacted S. 2488; 110 Enacted S. 2488*

BILL TRACKING REPORT:          110 Bill Tracking S. 2488
FULL TEXT VERSION(S) OF BILL:  110 S. 2488

An Act

To promote accessibility, accountability, and openness in Government by strengthening *section 552 of title 5, United States Code* (commonly referred to as the Freedom of Information Act), and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

[*1] SECTION 1. SHORT TITLE.

This Act may be cited as the "Openness Promotes Effectiveness in our National Government Act of 2007" or the "OPEN Government Act of 2007".

[*2] SEC. 2. FINDINGS.

Congress finds that--

(1) the Freedom of Information Act was signed into law on July 4, 1966, because the American people believe that--

(A) our constitutional democracy, our system of self-government, and our commitment to popular sovereignty depends upon the consent of the governed;

(B) such consent is not meaningful unless it is informed consent; and

(C) as Justice Black noted in his concurring opinion in *Barr v. Matteo (360 U.S. 564 (1959)),* "The effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees.";

(2) the American people firmly believe that our system of government must itself be governed by a presumption of openness;

(3) the Freedom of Information Act establishes a "strong presumption in favor of disclosure" as noted by the United States Supreme Court in *United States Department of State v. Ray (502 U.S. 164 (1991)),* a presumption that applies to all agencies governed by that Act;

(4) "disclosure, not secrecy, is the dominant objective of the Act," as noted by the United States Supreme Court in *Department of Air Force v. Rose (425 U.S. 352 (1976));*

(5) in practice, the Freedom of Information Act has not always lived up to the ideals of that Act; and

(6) Congress should regularly review *section 552 of title 5, United States Code* (commonly referred to as the Freedom of Information Act), in order to determine whether further changes and improvements are necessary to ensure that the Government remains open and accessible to the American people and is always based not upon the "need to know" but upon the fundamental "right to know".

[*3] SEC. 3. PROTECTION OF FEE STATUS FOR NEWS MEDIA.

110 P.L. 175, *; 121 Stat. 2524;
2007 Enacted S. 2488; 110 Enacted S. 2488

*Section 552(a)(4)(A)(ii) of title 5, United States Code*, is amended by adding at the end the following:

"In this clause, the term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term 'news' means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of 'news') who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.".

[*4]  SEC. 4. RECOVERY OF ATTORNEY FEES AND LITIGATION COSTS.

(a) In General.--*Section 552(a)(4)(E) of title 5, United States Code*, is amended--

(1) by inserting "(i)" after "(E)"; and

(2) by adding at the end the following:

"(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

"(I) a judicial order, or an enforceable written agreement or consent decree; or

"(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.".

(b) Limitation.--Notwithstanding *section 1304 of title 31, United States Code*, no amounts may be obligated or expended from the Claims and Judgment Fund of the United States Treasury to pay the costs resulting from fees assessed under *section 552(a)(4)(E) of title 5, United States Code*. Any such amounts shall be paid only from funds annually appropriated for any authorized purpose for the Federal agency against which a claim or judgment has been rendered.

[*5]  SEC. 5. DISCIPLINARY ACTIONS FOR ARBITRARY AND CAPRICIOUS REJECTIONS OF REQUESTS.

*Section 552(a)(4)(F) of title 5, United States Code*, is amended--

(1) by inserting "(i)" after "(F)"; and

(2) by adding at the end the following:

"(ii) The Attorney General shall--

"(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

"(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

"(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).".

[*6]  SEC. 6. TIME LIMITS FOR AGENCIES TO ACT ON REQUESTS.

(a) Time Limits.--

(1) In general.-- *Section 552(a)(6)(A) of title 5, United States Code*, is amended by inserting after clause (ii) the following:

"The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

110 P.L. 175, *; 121 Stat. 2524;
2007 Enacted S. 2488; 110 Enacted S. 2488

"(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

"(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.".

(2) Effective date.-- The amendment made by this subsection shall take effect 1 year after the date of enactment of this Act.

(b) Compliance With Time Limits.--

(1) In general.----

(A) Search fees.--*Section 552(a)(4)(A) of title 5, United States Code*, is amended by adding at the end the following:

"(viii) An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.".

(B) Public liaison.--*Section 552(a)(6)(B)(ii) of title 5, United States Code*, is amended by inserting after the first sentence the following: "To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency.".

(2) Effective date and application.-- The amendment made by this subsection shall take effect 1 year after the date of enactment of this Act and apply to requests for information under *section 552 of title 5, United States Code*, filed on or after that effective date.

[*7]  SEC. 7. INDIVIDUALIZED TRACKING NUMBERS FOR REQUESTS AND STATUS INFORMATION.

(a) In General.--*Section 552(a) of title 5, United States Code*, is amended by adding at the end the following:

"(7) Each agency shall--

"(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

"(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including--

"(i) the date on which the agency originally received the request; and

"(ii) an estimated date on which the agency will complete action on the request.".

(b) Effective Date and Application.--The amendment made by this section shall take effect 1 year after the date of enactment of this Act and apply to requests for information under *section 552 of title 5, United States Code*, filed on or after that effective date.

[*8]  SEC. 8. REPORTING REQUIREMENTS.

(a) In General.--*Section 552(e)(1) of title 5, United States Code*, is amended--

(1) in subparagraph (B)(ii), by inserting after the first comma "the number of occasions on which each statute was relied upon,";

(2) in subparagraph (C), by inserting "and average" after "median";

(3) in subparagraph (E), by inserting before the semicolon ", based on the date on which the requests were received by the agency";

(4) by redesignating subparagraphs (F) and (G) as subparagraphs (N) and (O), respectively; and

(5) by inserting after subparagraph (E) the following:

110 P.L. 175, *; 121 Stat. 2524;
2007 Enacted S. 2488; 110 Enacted S. 2488

"(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

"(G) based on the number of business days that have elapsed since each request was originally received by the agency--

"(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

"(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

"(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

"(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

"(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

"(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

"(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

"(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

"(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

"(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;".

(b) Applicability to Agency and Each Principal Component of the Agency.--*Section 552(e) of title 5, United States Code*, is amended--

(1) by redesignating paragraphs (2) through (5) as paragraphs (3) through (6), respectively; and

(2) by inserting after paragraph (1) the following:

"(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.".

(c) Public Availability of Data.--*Section 552(e)(3) of title 5, United States Code*, (as redesignated by subsection (b) of this section) is amended by adding at the end "In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request.".

[*9]  SEC. 9. OPENNESS OF AGENCY RECORDS MAINTAINED BY A PRIVATE ENTITY.

*Section 552(f) of title 5, United States Code*, is amended by striking paragraph (2) and inserting the following:

"(2) 'record' and any other term used in this section in reference to information includes--

"(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

"(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.".

110 P.L. 175, *; 121 Stat. 2524;
2007 Enacted S. 2488; 110 Enacted S. 2488

[*10]  SEC. 10. OFFICE OF GOVERNMENT INFORMATION SERVICES.

(a) In General.--*Section 552 of title 5, United States Code*, is amended by adding at the end the following:

"(h)(1) There is established the Office of Government Information Services within the National Archives and Records Administration.

"(2) The Office of Government Information Services shall--

"(A) review policies and procedures of administrative agencies under this section;

"(B) review compliance with this section by administrative agencies; and

"(C) recommend policy changes to Congress and the President to improve the administration of this section.

"(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

"(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

"(j) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

"(k) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency--

"(1) have agency-wide responsibility for efficient and appropriate compliance with this section;

"(2) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

"(3) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

"(4) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

"(5) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

"(6) designate one or more FOIA Public Liaisons.

"(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.".

(b) Effective Date.--The amendments made by this section shall take effect on the date of enactment of this Act.

[*11]  SEC. 11. REPORT ON PERSONNEL POLICIES RELATED TO FOIA.

Not later than 1 year after the date of enactment of this Act, the Office of Personnel Management shall submit to Congress a report that examines--

(1) whether changes to executive branch personnel policies could be made that would--

(A) provide greater encouragement to all Federal employees to fulfill their duties under *section 552 of title 5, United States Code*; and

(B) enhance the stature of officials administering that section within the executive branch;

(2) whether performance of compliance with *section 552 of title 5, United States Code*, should be included as a factor in personnel performance evaluations for any or all categories of Federal employees and officers;

110 P.L. 175, *; 121 Stat. 2524;
2007 Enacted S. 2488; 110 Enacted S. 2488

(3) whether an employment classification series specific to compliance with sections 552 and 552a of title 5, United States Code, should be established;

(4) whether the highest level officials in particular agencies administering such sections should be paid at a rate of pay equal to or greater than a particular minimum rate; and

(5) whether other changes to personnel policies can be made to ensure that there is a clear career advancement track for individuals interested in devoting themselves to a career in compliance with such sections; and

(6) whether the executive branch should require any or all categories of Federal employees to undertake awareness training of such sections.

[*12]  SEC. 12. REQUIREMENT TO DESCRIBE EXEMPTIONS AUTHORIZING DELETIONS OF MATERIAL PROVIDED UNDER FOIA.

*Section 552(b) of title 5, United States Code*, is amended in the matter after paragraph (9)--

(1) in the second sentence, by inserting after "amount of information deleted" the following: ", and the exemption under which the deletion is made,"; and

(2) in the third sentence, by inserting after "amount of the information deleted" the following: ", and the exemption under which the deletion is made,".

Speaker of the House of Representatives.
Vice President of the United States and President of the Senate.

EXHIBIT 2

2 of 5 DOCUMENTS

Copyright 2006 Los Angeles Times
All Rights Reserved
Los Angeles Times

August 20, 2006 Sunday
Home Edition

**SECTION:** BUSINESS; Business Desk; Part C; Pg. 1

**LENGTH:** 3107 words

**HEADLINE:** Desert Connections

**BYLINE:** Chuck Neubauer and Richard T. Cooper, Times Staff Writers

**DATELINE:** Coyote Springs, Nev.

**BODY:**

Even now, as heavy equipment peels back the cactus and creosote bush to carve out roads and building sites, it's hard to believe that this 67-square-mile tract of empty desert will blossom into one of the biggest cities in the fastest-growing state in the country and the projected home to more than 200,000 people.

One of the most inhospitable places in the country, Coyote Springs Valley is so barren that, until recently, its best use was thought to be as a weapons test range.

Yet the valley -- an hour northeast of Las Vegas -- is on its way to becoming a real estate development of historic proportions, with as many as 159,000 homes, 16 golf courses and a full complement of stores and service facilities. At nearly 43,000 acres, Coyote Springs covers almost twice as much space as the next-largest development in a state famous for outsized building projects.

By comparison, Irvine Co., one of Southern California's largest developers, controls about 44,000 acres in Orange County.

Helping make Coyote Springs come alive was an alliance between a multimillionaire developer and one of the highest-ranking members of Congress: Nevada Democrat Harry Reid, the Senate minority leader and a member of the powerful Senate Appropriations Committee.

The relationship between developers such as Harvey Whittemore and politicians such as Reid is especially close in Nevada, home to a small fraternity of movers and shakers, powerful demands of rapid population growth and a huge amount of federally owned land.

Over the last four years, Reid has used his influence in Washington to help the developer, Nevada super-lobbyist Whittemore, clear obstacles from Coyote Springs' path.

At one point, Reid proposed opening the way for Whittemore to develop part of the site for free -- something for which the developer later agreed to pay the government $10 million.

Desert Connections Los Angeles Times August 20, 2006 Sunday

As the project advanced, Reid received tens of thousands of dollars in campaign contributions from Whittemore. The contributions not only went to Reid's Senate campaigns, but also to his leadership fund, which he used to help bankroll the campaigns of Democratic colleagues.

Whittemore also helped advance the legal careers of two of Reid's four sons. One of the two, Leif Reid, who is Whittemore's personal lawyer, has represented the developer throughout the Coyote Springs project, including in negotiations with federal officials.

Whittemore, solidly built and well over 6 feet tall, is a partner in Nevada's biggest law firm and a veteran lobbyist for the state's gambling, liquor and tobacco industries.

His influence crosses party lines. Nevada's junior U.S. senator, Republican John Ensign, and GOP Rep. Jim Gibbons, whose district includes Coyote Springs, supported the project at key stages. But Reid's power in the Senate sets him apart and his relationship with Whittemore is deeply rooted.

"You have to understand how close the Whittemore and Reid families are," the developer said recently. "My relationship with Sen. Reid goes back decades." The senator concurs, calling Whittemore a longtime friend.

In a small state, Whittemore said, personal relationships are particularly important: "This is not New York. This is Nevada."

Reid, who declined to be interviewed for this article, cites economic grounds for his support of the project, as do his Nevada congressional colleagues.

"There is a reason every major Republican and Democratic officeholder in Nevada has fought for Coyote Springs -- it will create jobs and make the state an even better place to live and raise a family," said a Reid spokesman.

Nevada's congressional delegation has treated Whittemore no differently from any other developer, Reid's office said.

'Unique in the World'

For Whittemore, Coyote Springs is more than a financial investment. In words that soar beyond developers' customary hyperbole, he called it an opportunity "to create a beautiful place which is unique in the world -- not just Nevada or the United States, but the world."

More than a decade ago, Whittemore recognized the site's potential. It is 5 miles wide and stretches 13 miles along the east side of U.S. 93 between parallel mountain ranges.

Equally important, the site was in private hands -- rare in a state where the federal government owns 87% of the land. Nothing remotely as large and well-located might come on the market again.

There was just one catch: For all its possibilities, the land had serious obstacles to development that only the federal government could remove.

First, Congress had created a mile-wide power line corridor covering 10,500 acres and running the length of the property close to the highway. No power lines had been built, but development inside the corridor seemed to be precluded.

A second problem was that ancient stream beds and washes crisscrossed the site. Though dry most of the year, as part of the valley's ecosystem they could not be bulldozed or otherwise altered without federal permits.

In addition, while the private owner controlled all 42,842 acres, the federal government had retained title to almost

Desert Connections Los Angeles Times August 20, 2006 Sunday

a third of those acres to maintain a preserve for the desert tortoise, Nevada's state reptile, which is shielded by the Endangered Species Act.

The tortoise's habitat was concentrated in a wedge-shaped area in the middle of the site. Here too, development seemed to be prohibited.

"For eight years, almost on a daily basis I have been working on solving the problems of the site," Whittemore said recently.

Today, with the obstacles gone and construction under way, Whittemore's efforts seem to have paid off.

Land's Recent History

It was the exigencies of national security that put Coyote Springs in play. In 1988, Congress turned the land over to defense contractor Aerojet-General Corp. to test rockets. The southern third of the land is in Clark County, which includes Las Vegas, and the rest is in Lincoln County.

The rocket range was never created and the land remained essentially untouched until 1998, when Whittemore paid Aerojet-General at least $15 million for title to the privately owned portion of the site and for the rights under a rent-free government lease of the tortoise habitat.

Soon afterward, Whittemore reduced his financial exposure by selling the rights to 7,500 acre-feet of groundwater and a well to the Southern Nevada Water Authority for $25 million. But he retained other water rights at Coyote Springs and has agreements with Lincoln County and its private water company partner to buy more for the development.

Almost immediately, Whittemore began to push for the title to -- and unrestricted use of -- the tortoise habitat in the middle of the site. He argued that moving the tortoise preserve to the eastern edge of the site, where it would abut federal land, would help the desert tortoise and remove an impediment to his project.

In 1999, regional officials of the Interior Department refused, saying that only Congress could approve moving the preserve. Over the next five years, Whittemore bombarded the government with proposals.

Finally, in 2004, the Bureau of Land Management agreed to give him title to nearly 10,000 acres of tortoise land in the middle of his site in exchange for equal acreage along the fringes. They called the swap a "minor" boundary adjustment.

Appraisal Not Done

No federal appraisal was made to determine whether the land the government got was equal in value to the land it gave up, and some public land experts say the exchange may have been illegal.

"The law clearly wouldn't allow a 'boundary adjustment' of 10,000 acres," said Janine Blaeloch of the Western Lands Project, a group that advocates for public lands. "Congress drew the map of the leased lands. Congress would have to change it."

The bureau said it agreed to the land swap because the U.S. Fish and Wildlife Service said moving the preserve would be good for the tortoise.

Neither Sen. Reid nor Leif Reid played a role in getting the tortoise preserve relocated, Whittemore said.

In 2002, Sen. Reid went to work on removing the power line corridor.

Desert Connections Los Angeles Times August 20, 2006 Sunday

First, he and others in Nevada's congressional delegation tucked an obscurely worded provision into a huge land bill to benefit a wide range of interests in Clark County. The provision shifted the power corridor off Whittemore's land and onto federal land along the west side of U.S. 93.

The land west of the highway had been earmarked for "wilderness study," but a separate section of the bill reclassified the land to allow power lines.

As drafted, the bill would have done Whittemore a large financial favor: It required him to pay nothing for getting the power corridor moved to the west side of the highway -- even though it increased the value of his 10,500 acres on the east side by clearing it for development.

The giveaway prompted questions from the Bureau of Land Management and the Senate Energy and Natural Resources Committee.

With the legislative clock running out, Reid and his Nevada colleagues backed off, removing from the bill the provision moving the power line corridor.

But another provision -- one that reclassified the status of the land on the west side so that it eventually could accommodate a power line corridor -- survived, and President Bush signed the bill in November 2002.

A year and a half later, Reid and the Nevada delegation tried again, inserting language moving the power corridor to the west side of the highway into a public land bill for Lincoln County.

This time, Whittemore had to compensate the government on the basis of "fair market value," but that was defined in such a way that would have required him to pay only about $160,000.

Drawing fresh criticism, Reid and the delegation changed the cost provision to say government appraisers should determine what Whittemore had to pay -- $10.4 million as it turned out. The bill became law in November 2004.

Just before that bill was passed, Whittemore announced a deal with Westwood-based Pardee Homes to become Coyote Springs' main residential developer. He also announced that Jack Nicklaus would design a set of golf courses to be known as the Bear Trail.

As the effort to clear a path for Coyote Springs moved forward, Whittemore showed his appreciation for the help Nevada politicians in Washington were giving him, especially Reid. Ensign and others got contributions, but significantly less than those given to Reid.

Political Funding

Since 2000, Whittemore, his wife and the Coyote Springs company have given Reid's senatorial campaign and political action committees at least $45,000. That included $35,000 for Reid's leadership PAC, the Searchlight Leadership Fund, which helped him advance as a Senate leader. Most of that money was contributed in 2002 shortly after Reid introduced the Clark County land bill.

In 2000, Whittemore gave an additional $20,000 to the Democratic Senatorial Campaign Committee, which Reid promoted as a party leader. Prior to 2000, the Whittemores had given Reid and his Senate campaign committee a total of $6,500, plus $5,000 for his leadership PAC.

Whittemore also helped Reid's sons, all of whom at various times have worked for the law firm in which he is a senior partner, Lionel, Sawyer and Collins. Rory Reid is a partner in the firm. When he ran successfully for the Clark County Board of Commissioners, Whittemore contributed $5,000.

He also gave Josh Reid $5,000 for an unsuccessful bid for a seat on the city council in Cottonwood Heights, Utah.

Desert Connections Los Angeles Times August 20, 2006 Sunday

Rory and Josh Reid have been active in Democratic politics.

Jon Summers, an aide to Sen. Reid, said, "Harvey Whittemore has a history of giving money to political candidates far and wide -- and to both political parties.

"However," he added, "as a registered Democrat, it is only logical that he would give a larger percentage to Democratic candidates and committees."

By the spring of 2005, only one step remained: securing a permit to deal with the stream beds and washes.

That process, handled by the Army Corps of Engineers, seemed routine, but in late July trouble struck.

Alexis Strauss, an official in the Environmental Protection Agency's regional office that oversees Nevada, notified the Corps of Engineers that her office had concerns.

"We respectfully object to the issuance of a permit for the proposed project because the authorization may result in substantial and unacceptable impacts to aquatic resources of national importance," Strauss wrote.

The phrase, "aquatic resources of national importance," was a designation that gave regional EPA officials maximum leverage to press for environmental concessions.

Rarely Invoked

Invoking such aquatic resources is rare -- done in only 1% or 2% of the permit applications that the regional office reviews every year, according to Tim Vendlinski, head of wetland regulation. "They weren't happy when they got that letter," he said of Whittemore and Coyote Springs.

Whittemore had not seen the EPA move coming and he called Nevada officials, his fellow-developers, Sens. Ensign and Reid, and Leif Reid.

Less than a week after the issue arose, Sen. Reid's then-top aide for energy and environment, Peter Umhofer, called the regional office. Whittemore said he had asked Umhofer to set up a meeting for him with federal officials. Umhofer also contacted the Corps of Engineers.

Officials at both agencies got the message that Reid was deeply interested in Coyote Springs, and Vendlinski made clear that Umhofer's intervention had upped the stakes.

"Any time a congressman calls, it kicks it up above my level. We treat correspondence from staff with as much weight as from congressmen," Vendlinski said.

At an Aug. 16, 2005, meeting, Whittemore, Leif Reid and their consultants tried to persuade the EPA to drop the aquatic resource designation. "They saw our letter as something that would bring their project to a halt," said John Kemmerer, the senior EPA official at the meeting. "They were interested in us rescinding it."

The EPA officials refused.

"It was a bitter pill for them," Vendlinski said. "The meeting did not end with a group hug."

Nonetheless, the developer and the federal agencies agreed to meet again in September.

Meantime, Sens. Reid and Ensign called EPA Administrator Stephen L. Johnson in Washington. The senators said Nevada developers were complaining about undue delays on permits.

Whittemore says he did not instigate the phone call by Reid and Ensign.

Desert Connections Los Angeles Times August 20, 2006 Sunday

On Sept. 20, two days before Reid and Ensign were to confer with Johnson, three Reid staffers called the EPA regional officials to express Reid's concerns about permits, including developers' complaints that the EPA had become more demanding.

The next day, EPA regional officials sent briefing papers to Washington to help Johnson prepare for his talk with the senators. An e-mail from a senior EPA official made clear which way the wind was blowing.

"I've taken the liberty of shortening the talking points and making them sound more conciliatory," said John Reeder, who's in the EPA's congressional relations office. When talking with the senators, "the administrator needs to hear them out and not take an argumentative stance," he said. "Let me know if you have any heartburn over this."

When Johnson talked to the two senators, they reiterated developers' complaints about the EPA's regional office and expressed the developers' concern about their ability to get permits in the future.

"It was very unusual for two senators to go directly to the administrator," Strauss, the EPA regional official, said.

At some point in the process, Leif Reid called his father's office about the permit issue. Sen. Reid's office says the call had no effect on the senator's actions.

Office Lobbying Rule

In 2001, the senator's office established a rule that family members could lobby his office but could not get special treatment. In 2002, responding to questions by The Times, the rule was changed to prohibit any lobbying of Sen. Reid's office by his family.

"For the last four years, our office has had a policy that Reid family members are not to lobby the office on business matters, even if those matters benefit Nevada," Susan McCue, Reid's chief of staff, said last week.

"Leif is not a lobbyist, but he should not have called our office. I have reminded Leif of this policy to prevent future calls," she said in a statement. Leif Reid did not respond to questions.

The contacts by Leif Reid and others "were not an attempt to have Sen. Reid's office direct the outcome of the federal permitting process," Whittemore said.

As it happened, by the time Sens. Reid and Ensign had their conversation with the head of the EPA, Whittemore's permit problem was all but over.

On Sept. 16, Whittemore, Leif Reid and others had met with EPA and other federal officials at the site and the atmosphere became conciliatory.

Coyote Springs agreed to leave several washes untouched, reduced the number of acres of waterways to be filled in and pledged to make environmental improvements on 19 acres of other wash land.

And Whittemore promised not to disturb the Pahranagat Wash, which runs through the site. Since Pahranagat is subject to flash flooding, development there was impractical, but Whittemore made its protected status official.

"They took our concerns seriously," Vendlinski said.

For their part, the regional officials were not looking for a fight. Whittemore had demonstrated that he could bring Sens. Reid and Ensign into the game.

Privately, some regional EPA officials said they knew their superiors in Washington would not support a hard line on aquatic resources.

Desert Connections Los Angeles Times August 20, 2006 Sunday

The regional officials not only withdrew their objections, but in April 2006 they also gave Whittemore's project an award for "environmentally sensitive improvements" in its plans. A smiling Leif Reid accepted the award.

"One year and $1 million in consulting fees later, we got our permit," Whittemore said ruefully in an interview in May.

"It is the right thing to do," he said, "and there is an economic incentive in making the project proceed."

As Coyote Springs grows onto the Lincoln County portion of the site, more permits will be needed. But Whittemore's dream is on its way to coming true.

Looking back, he expresses pride in the achievement, and in how far he went to meet environmental and other concerns.

"The final product is the most environmentally friendly development ever proposed in Nevada," Whittemore said. "I want people to understand that I am the platinum standard."

\*

Neubauer reported from Coyote Springs and Cooper from Washington.

\*

()

Cutting red tape

Nevada lobbyist Harvey Whittemore controls a 42,842-acre project called Coyote Springs, northeast of Las Vegas. These maps show original obstacles to development of the project and how they were dealt with.

**GRAPHIC:** GRAPHIC: MAP: Cutting red tape (Nevada)  CREDIT: Doug Stevens Los Angeles Times PHOTO: CHANGES COMING: As envisioned by its backers, the Coyote Springs development in a desert valley in southeast Nevada eventually will have more than 200,000 residents.  PHOTOGRAPHER: Brian Vander Brug Los Angeles Times PHOTO: BIG VALLEY: Harvey Whittemore, a lawyer and lobbyist, checks out part of his 67-square-mile Coyote Springs development.  PHOTOGRAPHER: Steve Marcus Las Vegas Sun PHOTO: DEVELOPER: Harvey Whittemore, the huge project's guiding force.  PHOTOGRAPHER: Nevada Appeal PHOTO: U.S. SENATOR: Harry Reid helped the Coyote Springs project through Washington.  PHOTOGRAPHER: European Pressphoto Agency PHOTO: GOING FOR THE GREEN: A crew works on one of 16 golf courses that are planned for the Coyote Springs development in a desert valley outside Las Vegas.  PHOTOGRAPHER: Steve Marcus Las Vegas Sun

**LOAD-DATE:** August 20, 2006

EXHIBIT 3

# UNITED STATES ATTORNEY'S OFFICE
## FOR THE DISTRICT OF COLUMBIA

555 4TH STREET, NW
WASHINGTON, DC 20530
(202) 514-7566

SEARCH
HOME
U.S. ATTORNEY
ABOUT US
DIVISIONS
COMMUNITY PROSECUTION
PROGRAMS FOR YOUTH
VICTIM WITNESS ASSISTANCE
PARTNERSHIPS
PRESS RELEASES
EMPLOYMENT
ESPAÑOL
CONTACT US
LINKS
SITE MAP

## LAFFEY MATRIX 2003-2008

| Experience | 03-04 | 04-05 | 05-06 | 06-07 | 07-08 |
|---|---|---|---|---|---|
| 20+ years | 380 | 390 | 405 | 425 | 440 |
| 11-19 years | 335 | 345 | 360 | 375 | 390 |
| 8-10 years | 270 | 280 | 290 | 305 | 315 |
| 4-7 years | 220 | 225 | 235 | 245 | 255 |
| 1-3 years | 180 | 185 | 195 | 205 | 215 |
| Paralegals & Law Clerks | 105 | 110 | 115 | 120 | 125 |

Years (Rate for June 1 - May 31, based on prior year's CPI-U)

### Explanatory Notes

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. See, e.g., 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412 (b) (Equal Access to Justice Act). The matrix does not apply in cases in which the hourly rate is limited by statute. See 28 U.S.C. § 2412(d).

2. This matrix is based on the hourly rates allowed by the District Court in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), cert. denied, 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The column headed "Experience" refers to the years following the attorney's graduation from law school. The various "brackets" are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). See Laffey, 572 F. Supp. at 371.

3. The hourly rates approved by the District Court in Laffey were for work done principally in 1981-82. The Matrix begins with those rates. See Laffey, 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4. Use of an updated Laffey Matrix was implicitly endorsed by the Court of Appeals in Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated Laffey Matrix prepared by the United States Attorney's Office as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area. See Covington v. District of Columbia, 57 F.3d 1101, 1105 & n. 14, 1109 (D.C. Cir. 1995), cert. denied, 516 U.S. 1115 (1996). Lower federal courts in the District of Columbia have used this updated Laffey Matrix when determining whether fee awards under fee-shifting statutes are reasonable. See, e.g., Blackman v. District of Columbia, 59 F. Supp. 2d 37, 43 (D.D.C. 1999); Jefferson v. Milvets System Technology, Inc., 986 F. Supp. 6, 11 (D.D.C. 1997); Ralph Hoar & Associates v. Nat'l Highway Transportation Safety Admin., 985 F. Supp. 1,

**Last Updated on 07/06/2007**

9-10 n.3 (D.D.C. 1997); *Martini v. Fed. Nat'l Mtg Ass'n*, 977 F. Supp. 482, 485 n.2 (D.D.C. 1997); *Park v. Howard University*, 881 F. Supp. 653, 654 (D.D.C. 1995).

EXHIBIT 4

ITEMIZATION OF ATTORNEY/PARALEGAL TIME
AND LITIGATION EXPENSES
IN JUDICIAL WATCH, INC. v. BUREAU OF LAND MANAGEMENT

| Date | Name | Description of Services | Hours | Total |
|------|------|--------------------------|-------|-------|
| 9/4/07 | PJO | Conference with DG re: status of FOIA requests to Bureau of Land Management; review file re: same; draft complaint; conferences with DFR re: finalizing and filing same | 1.00 | $390.00 |
| 9/4/07 | DR | Conferences with PJO re: complaint | 0.25 | $31.25 |
| 9/5/07 | PJO | Conferences with DFR re: finalizing and filing complaint and related documents; review final version of complaint | 0.50 | $195.00 |
| 9/5/07 | DR | Proofread complaint; conferences with PJO re same; prepared same for filing and service; filed and served same | 3.50 | $437.50 |
| 9/20/07 | PJO | Telephone conference with Wall Street Journal reporter re: status of FOIA request and complaint | 0.25 | $97.50 |
| 10/4/07 | PJO | Review notice of appearance by defense counsel; review e-mail from alternate defense counsel re: entry of appearance | 0.10 | $39.00 |
| 10/15/07 | PJO | Review order setting schedule for dispositive motions; exchange e-mail with opposing counsel re: same | 0.50 | $195.00 |
| 10/17/07 | PJO | Exchange e-mail with opposing counsel re: submission of search declaration and extension of time for BLM to file dispositive motion | 0.25 | $97.50 |
| 11/13/07 | PJO | Review affidavits from BLM re: search; conferences with MLD and DG re: same | 0.25 | $97.50 |
| 11/19/07 | PJO | Conferences with MLD and DG re: issues with BLM's search affidavits; e-mail to opposing counsel re: same; telephone conference with opposing counsel re: same; review joint motion for extension of time to allow BLM to address/respond to concerns about search affidavits | 1.50 | $585.00 |
| 12/11/07 | PJO | Telephone conference with opposing counsel re: agreement to court-ordered search; conference with CJF re: same | 0.25 | $97.50 |
| 1/22/08 | JFP | Preparation of motion for attorney's fees and exhibits; file same | 2.50 | $975.00 |

### ATTORNEY/PARALEGAL TIME RECAP

| | | |
|---|---|---|
| Paul J. Orfanedes | 4.60 hours @ $390.00 per hour | $1,794.00 |
| James F. Peterson | 2.50 hours @ $390.00 per hour | $975.00 |
| David F. Rothstein | 3.75 hours @ $125.00 per hour | $468.75 |
| **TOTAL:** | | **$3,237.75** |

## LITIGATON EXPENSES

Filing Fee                                                                                    $350.00

Certified Mailing Fees for Service of Complaint                                               $17.82

**TOTAL:**                                                                                    **$367.82**

## VERIFICATION

I verify, under penalty of perjury, that the foregoing Itemization of Attorney/Paralegal Time in Judicial Watch, Inc. v. Bureau of Land Management is true and correct to the best of my knowledge and belief. Executed in Washington, D.C. on January 22, 2008.

James F. Peterson