UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1570 (RCL) |
| | ) | |
| BUREAU OF LAND | ) | |
| MANAGEMENT, | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Now before the Court comes plaintiff Judicial Watch, Inc.'s Verified Motion for an Award of Attorney's Fees and Litigation Expenses [14]. Upon consideration of the motion, defendant Bureau of Land Management's opposition [18], plaintiff's reply [20], defendant's supplement [21], the entire record herein, and the applicable law, the Court will GRANT plaintiff's motion.


I.     **BACKGROUND**

Plaintiff Judicial Watch, Inc. filed a suit under the Freedom of Information Act seeking to compel defendant Bureau of Land Management to release certain requested documents. After both parties filed pleadings, defendant released to plaintiff the relevant documents, and the parties settled all claims without court intervention. Plaintiff now seeks $3,605.57 from defendant as compensation for attorney's fees and expenses associated with this litigation. Defendant, in response, contests plaintiff's right to collect such fees and expenses.

1

A.    **Factual Background**

Plaintiff Judicial Watch, Inc. is a not-for-profit organization dedicated to promoting

transparency and accountability in government through investigation and dissemination to the

public of information regarding official misconduct.  About Judicial Watch - Our Mission (June

20, 2008), http://www.judicialwatch.org/mission.html.  Attempting to further this mission,

plaintiff on March 8, 2007 submitted to defendant Bureau of Land Management ("BLM") a

request for certain information, pursuant to the Freedom of Information Act ("FOIA").  (Compl.

¶ 5.)  Specifically, plaintiff sought release of all documents regarding the activities of three high-

ranking federal officials in connection with land transactions in Coyote Springs Valley, Nevada.

(*Id.*)  Defendant subsequently acknowledged receipt of the request in an e-mail dated March 9,

2007.  (Decl. B. Brown ¶ 2.)  After processing the request, defendant's FOIA Coordinator

distributed copies to the appropriate divisions in the Washington, D.C. office and forwarded a

copy to defendant's Nevada office.  (*Id.* ¶¶ 3-4.)

Though FOIA requires governmental response within twenty days after a request is

received, *see* Freedom of Information Act, 5 U.S.C. § 552(a)(6)(A) (2007), defendant failed to

substantively address plaintiff's response until April 27, 2007, fifty days after its initial receipt

(*see* Opp. Ex. 1).[1]  In the events giving rise to the underlying action, plaintiff continually asked

defendant for updates as to the status of its requests.  (*See id.*)  Defendant responded four

separate times with the following anticipated dates of completion of the review process: May 11,

---

[1]Defendant's first response, on March 9, 2007, merely acknowledged receipt of plaintiff's FOIA request and assigned to it a tracking number.  Such a brief response failed to meet the standard articulated in the FOIA statute, which requires the relevant government agency to disclose whether it intends to honor the request and state the reasons for the decision.  *See* 5 U.S.C. § 552(a)(6)(A).

2

2007; July 20, 2007; August 3 2007; August 7, 2007.  (*See id.*)  Each date passed, however, without any explanation, forcing plaintiff to continue to seek updates.  (*See id.*)  Defendant, as justification for its delays, pointed to the paucity of personnel handling FOIA issues and the emergence of "hot issues" meriting immediate attention, but it nevertheless continued to set self-imposed deadlines that it failed to meet.  (*See id.*)

Almost a month after defendant's fourth anticipated release date passed without explanation, plaintiff filed this action on September 5, 2007, seeking a court order compelling defendant to disclose to it the relevant documents.  (Compl. ¶ 10.)  Defendant, on September 20, 2007, responded to the suit by producing and sending to plaintiff thirty-five pages of documents relevant to the initial request, excepting one phone number which qualified for an exemption.  (Opp. 5-6.)  Plaintiff, however, expressed its concern to defendant about the sufficiency of the search.  (*See* Opp. Ex. 1.)  The two parties then met on October 16, 2007 in an effort to resolve the impasse without further litigation.  (*See* Pl. Mot. 3.)  Defendant agreed to conduct a supplemental search, but it found no additional information relevant to plaintiff's query.  (*Id.*)

Satisfied with the supplemental search, plaintiff elected not to challenge the adequacy of defendant's response to its initial request.  (*Id.*)  Accordingly, the parties on January 7, 2008 submitted to this Court a Stipulation of Entry of Judgment ("Stipulation").  (*See id.*)  The Stipulation briefly recited the preceding factual history and provided for the termination of plaintiff's claims, as all relevant documents had been produced.  (*See* Stipulation.)  Important to this stage of the litigation, the Stipulation expressly stated that "[p]laintiff reserves the right to seek an award of attorney's fees and litigation expenses pursuant to 5 U.S.C. § 552(a)(4)(E), and [d]efendant reserves the right to oppose any such request."  (Stipulation.)  Plaintiff took

3

advantage of this provision in filing on January 22, 2008 its Verified Motion for an Award of Attorney's Fees and Litigation Expenses.

### B.    <u>Statutory Background</u>

### 1.    **Overarching Principles of FOIA**

Congress reaffirmed its commitment to transparency in government in passing the OPEN Government Act of 2007, which included amendments to the FOIA statute. *See* OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524. Indeed, the legislature maintained that FOIA was signed into law because "[the] American people firmly believe that our system of government must itself be governed by a presumption of openness." *Id.* § 2. Congress felt the need to amend FOIA based on its recognition that attainment of the statute's ambitious objectives had too often been impeded in practice. *See id.* (noting further that regular review of FOIA is necessary to ensure that disclosure of governmental conduct is premised not on the "'need to know'" but rather on the "fundamental 'right to know.'").

In carrying out the mandate of FOIA, both Congress and the Supreme Court have tried vigilantly to establish a federal regime of cooperation and complete disclosure. *See* discussion *infra* Part I.B.1. Congress, for its part, emphasized that "disclosure, not secrecy, is the dominant objective of the Act." OPEN Government Act § 2. The Supreme Court pledged its commitment to upholding in practice the guiding ideals of the statute: "[FOIA] was intended to establish a general philosophy of full agency disclosure and to close the loopholes which allow agencies to deny legitimate information to the public." *GTE Sylvania, Inc. v. Consumers Union of the U.S., Inc.*, 445 U.S. 375, 385 (1980) (citations and internal quotation marks omitted).

### 2. Fee-shifting Provision Before *Buckhannon*

Prior to its most recent amendments, FOIA contained a rudimentary fee-shifting provision: "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E) (2002) (amended 2007). District of Columbia courts had applied the catalyst theory in order to assess a party's eligibility for fees under the statute. *See Oil, Chem., and Atomic Workers Int'l Union, AFL-CIO v. Dep't of Energy*, 288 F.3d 452, 454 (D.C. Cir. 2002) [hereinafter *OCAW*].

The catalyst theory, as interpreted by D.C. courts, allowed a FOIA plaintiff to recover attorney's fees "even though the district court had not rendered a judgment in the plaintiff's favor," providing that "the litigation substantially caused the requested records to be released." *Id.* (citations and internal quotation marks omitted). The causation inquiry focused on whether the plaintiff could prove that "prosecution of the action could reasonably be regarded as necessary to obtain the information and that a causal nexus exist[ed] between that action and the agency's surrender of that information." *Republic of New Afrika v. F.B.I.*, 645 F. Supp. 117, 118-19 (D.D.C. 1986) (internal quotation marks omitted). Clearing this hurdle made a plaintiff eligible to collect attorney's fees under FOIA. *Id.*

A FOIA plaintiff still had to prove entitlement in order to qualify for an award of attorney's fees, even after it had been deemed eligible by the court. *See Burka v. U.S. Dep't of Health and Human Serv.*, 142 F.3d 1286, 1288 (D.C. Cir. 1998). The entitlement stage of the analysis required the court to take into account four separate factors: (1) "public benefit derived from the case"; (2) "commercial benefit to the plaintiff"; (3) "nature of the plaintiff's interest in

the records"; and (4) "whether the Government had a reasonable basis for withholding

information." *Id.* (internal quotation marks omitted). A plaintiff was able to collect attorney's

fees provided the underlying action satisfied judicial requirements drawn from these criteria. *Id.*

### 3.    The Influence of *Buckhannon* on FOIA

The Supreme Court in 2001 substantially altered the landscape of statutory attorney's-fees

collection. *See Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human*

*Serv.*, 532 U.S. 598 (2001). The question before the Court in *Buckhannon* turned on whether the

term "prevailing party," as found in the Fair Housing Amendments Act ("FHAA") and

Americans with Disabilities Act ("ADA"), included a party that achieved a desired result through

the voluntary change in conduct of the opposing party. *See id.* at 600. The Court expressly

disclaimed the catalyst theory's application to these statutory fee-shifting provisions, reasoning

that it impermissibly "allows an award where there is no judicially sanctioned change in the legal

relationship of the parties." *Id.* at 605. The Court further explained that "[a] defendant's

voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to

achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* The Court

therefore limited the definition of "prevailing party" to include only those plaintiffs who

achieved their desired outcome through either judgment on the merits or a court-ordered consent

decree. *Id.* at 604.

Though the *Buckhannon* decision was technically confined to addressing fee-shifting

provisions under the FHAA and ADA, courts quickly extended its principles in rejecting the

catalyst theory's application to a host of other similar fee-shifting provisions. *See, e.g.*, *OCAW*,

288 F.3d at 456-57. The D.C. Circuit expressly overruled precedent mandating use of the

catalyst theory in assessing claims for attorney's fees under FOIA: "in order for plaintiffs in

FOIA actions to become eligible for an award of attorney's fees, they must have been awarded

some relief by a court, either in a judgment on the merits or in a court-ordered consent decree."

*Id.*  Under this new regime, a party's gains from private settlement lacked the judicial stamp

necessary for classification as a "prevailing party" for purposes of the FOIA fee-shifting

provision.  *See Summers v. U.S. Dep't of Justice*, 477 F. Supp. 2d 56, 67 (D.D.C. 2007).

### 4.    OPEN Government Act of 2007

From the outset, critics assailed the Supreme Court's decision in *Buckhannon*.  *See, e.g.*,

*Buckhannon*, 532 U.S. at 622 (Ginsburg, J., dissenting).  Justice Ginsburg derided the majority's

interpretation of the statute, forcefully declaring that "[n]othing in history, precedent, or plain

English warrants the anemic construction of the term 'prevailing party' the Court today

imposes." *Id.* at 623.  Policy concerns were particularly salient in Justice Ginsburg's analysis,

and she ruefully noted that the majority's "rejection of the 'catalyst theory' [] impede[s] access to

the court for the less well heeled, and shrink[s] the incentive Congress created for the

enforcement of federal law by private attorneys general." *Id.* at 622-23.

Sensitive to the same concerns illustrated by Justice Ginsburg in her dissent, Congress in

2007 passed, and President Bush on December 31, 2007 signed into law, the OPEN Government

Act of 2007 ("OPEN Government Act"), which altered the fee-shifting provision in FOIA to

remove it from under *Buckhannon*'s compass.  *See* 5 U.S.C. § 552(a)(4)(E).  FOIA's current fee-

shifting provision reads as follows:

> The court may assess against the United States reasonable attorney's fees and other
> litigation costs reasonably incurred in any case under this section in which the
> complainant has substantially prevailed.  For purposes of this subparagraph, a

7

complainant has substantially prevailed if the complainant has obtained relief through either (I) a judicial order, or an enforceable written agreement or consent decree, or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

*Id.*

Congress explicitly drew on concerns about the import of the Supreme Court's ruling in *Buckhannon* in explaining the impetus behind its amendments to FOIA:

> This bill also addresses a relatively new concern that, under current law, Federal agencies have an incentive to delay compliance with FOIA requests until just before a court decision is made that is favorable to a FOIA requestor. The Supreme Court's decision in [*Buckhannon*] eliminated the "catalyst theory" for attorneys' fees recovery under certain federal civil rights laws. When applied to FOIA cases, *Buckhannon* precludes FOIA requesters from ever being eligible to recover attorneys' fees under circumstances where an agency provides the records requested in the litigation just prior to a court decision that would have been favorable to the FOIA requestor. *The bill clarifies that* Buckhannon *does not apply to FOIA cases.* Under the bill, a FOIA requestor can obtain attorneys' fees when he or she files a lawsuit to obtain records from the Government and the Government releases those records before the court orders them to do so.

153 CONG. REC. S15701-04 (daily ed. Dec. 14, 2007) (statement of Sen. Leahy, sponsor of the OPEN Government Act of 2007) (emphasis added).

## II.    ANALYSIS

Defendant relies principally on two arguments in contesting plaintiff's motion: (1) the OPEN Government Act amendments to the FOIA fee-shifting provision cannot be applied retroactively, so *Buckhannon* must govern this Court's analysis, and plaintiff's claim fails when subject to that "prevailing-party" analysis; and (2) even if the amendments apply retroactively, plaintiff has not shown it is either eligible or entitled to an award of attorney's fees. For the reasons set forth below, this Court disagrees with both contentions and accordingly finds for

8

plaintiff.

A.     **Retroactive Application of OPEN Government Act**

Whether the recent FOIA amendments may be retroactively applied is a question of first impression in this circuit.  Indeed, the D.C. Circuit recently declined to explore the issue: "[b]ecause [plaintiff] 'substantially prevailed' by securing court orders requiring the government to disclose documents, we need not interpret the new statute or decide whether Congress intended it to apply to pending cases."  *Judicial Watch, Inc. v. F.B.I.*, 522 F.3d 364, 370 (D.C. Cir. 2008).

Defendant in its opposition focuses primarily on arguing that the amendments to FOIA's fee-shifting provision, as found in the OPEN Government Act, may not be applied retroactively. Since the conduct at issue in this action was completed before the Act was signed into law, defendant argues plaintiff's motion must be analyzed through the prism of *Buckhannon*.  In making this assertion, defendant relies on two bedrock legal principles: (1) the Supreme Court's presumption against retroactivity; and (2) the necessity of strictly construing waivers of sovereign immunity.

1.     **Impermissible Retroactive Effect**

Defendant first argues that application of the FOIA amendments to this case would produce an impermissible retroactive effect.  (*See* Opp. 9-13.)  Since Congress did not express on the face of the statute a clear desire for retroactive application, defendant continues, this Court must not infer such an intent.  (*See* Opp. 12.)  Based on a synthesis of relevant precedent and legislative history, this Court concludes that Congress intended that the OPEN Government Act fee-shifting amendments operate retroactively, and, furthermore, such application does not

9

produce an impermissible retroactive effect.

The Supreme Court in 1994 issued a landmark ruling on retroactive application of statutes. *See Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994). Though conceding that "prospectivity remains the appropriate default rule," the Court nevertheless stressed that "even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations." *Id.* at 272-73. The Court articulated a two-part analysis aimed at determining whether a statute may be applied retroactively. *See id.* at 280. First, a court must look to the text of the statute to see if Congress explicitly addressed the issue of retroactivity. *Id.* If, however, "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* Absent clear congressional intent to the contrary, a court must not apply an amendment retroactively if such application would produce an impermissible retroactive effect. *Id.*

The retroactivity analysis entails much more than simply looking at a timeline of the events in question: "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Id.* at 272. The inquiry demands close scrutiny and sufficient probing to determine "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* Indeed, "the conclusion that a particular rule [impermissibly] operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a

relevant past event." *Id.* This process often requires the court to pay significant attention to legislative history in framing its dissection of the issues. *See, e.g.*, *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 304-10 (1994). The necessary analysis is inevitably imprecise, "leav[ing] room for disagreement in hard cases," and it is "unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." *Landgraf*, 511 U.S. at 272; *see also I.N.S. v. St. Cyr*, 533 U.S. 289, 321 (2001) ("The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment . . . .").

The Supreme Court in *Landgraf* stated that retroactive application of attorney's-fees provisions would not usually have an impermissible effect. *Landgraf*, 511 U.S. at 278 (contrasting amendments allowing parties to seek statutorily-authorized awards of attorney's fees with those "affecting substantive rights, liabilities, or duties to conduct arising before their enactment"). The Court noted that attorney's-fees provisions are significantly dissimilar to other provisions analyzed in prior cases where retroactive application of statutes had been barred, explaining that attorney's-fee provisions are "'collateral to the main cause of action' and 'uniquely separable from the cause of action to be proved at trial.'" *Id.* at 277 (citations omitted). At least one court has drawn on this language in arguing amendments affecting FOIA's fee-shifting provision may be applied retroactively. *See Tax Analysts v. I.R.S.*, No. 96-2285, 2000 WL 689234 at *3 (D.D.C. March 31, 2000) (Kollar-Kotelly, J.) (finding that prior amendment which had potential to hinder attorney's fee collection under FOIA would not have impermissible retroactive effect under *Landgraf* because "FOIA never guaranteed that complainants could recover attorney's fees" as manifest in the circuit's practice of discretionary awarding of attorney's fees); *cf. Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 253 (D.D.C. 2002)

11

(holding statutory amendment was not "impermissibly retroactive" because plaintiff did not have sufficiently vested legal right under prior statutory language).

When refusing to retroactively apply statutory amendments, including those affecting awards of attorney's fees, courts have often partially justified their rulings with appeals to equity. *See, e.g.*, *St. Cyr*, 533 U.S. at 321 (stressing the unfairness of retroactively restricting individual's ability to avoid deportation after individual had relied on prior statute in making plea agreement); *E. Enter. v. Apfel*, 524 U.S. 498, 534 (1998) ("The distance into the past that the Act reaches back to impose a liability on Eastern and the magnitude of that liability raise substantial questions of fairness."). Indeed, the Supreme Court emphasized equitable grounds in refusing to retroactively apply an amended attorney's-fees provision, notwithstanding the seemingly contrary mandate in *Landgraf*. *See Martin v. Hadix*, 527 U.S. 343, 359-60 (1998). The Court held that retroactive application of a statute decreasing attorney's fee awards was unfair, and hence impermissible, where the new statute was not passed until almost ten years after the trial court awarded a set amount of attorney's fees to plaintiff. *Id.* Decreasing such a longstanding award would "upset the reasonable expectations of the parties," the Court reasoned. *Id.*

The preceding analysis of relevant precedent compels the conclusion that retroactive application of the OPEN Government Act would not produce an impermissible retroactive effect. Although modified in *Martin* and hence not an absolute mandate, the Supreme Court's general rule persists that alterations to attorney's-fees provisions would not operate impermissibly if applied retroactively. *See Landgraf*, 511 U.S. at 278. Moreover, at least one court in this district has held that amendments affecting attorney's-fees collection under FOIA may permissibly operate retroactively, notwithstanding absence of congressional intent in statutory text and

12

legislative history. *See Tax Analysts*, 2000 WL 689234 at *3. The amendments to the FOIA

provision, then, may permissibly be applied to this case according to precedent.

Moreover, the legislative history surrounding the enactment of the OPEN Government

Act serves as a testament to Congress's intent to sweep pending actions under the compass of the

amended fee-shifting provision. *See* 153 CONG. REC. S15701-04. The Supreme Court in *Rivers*

articulated a nuanced assessment of the relevant statute's legislative history. *See Rivers*, 511

U.S. at 304-10. The Court distinguished between congressional statements discussing a statute's

"restoration" of rights with those mentioning a statute's "enlargement" of rights, reasoning that

the former indicated an intent to retroactively apply amendments, whereas the latter evinced an

intent to limit application to prospective cases. *Id.* With regard to the adoption of the OPEN

Government Act, Senator Patrick Leahy, the bill's sponsor, stressed that "[t]he bill *clarifies* that

*Buckhannon does not* apply to FOIA cases." 153 CONG. REC S15701-04 (statement of Sen.

Leahy) (emphasis added). Senator Leahy's use of the word "clarify," along with his use of the

present tense in stating that the bill "does not apply" (rather than, for instance, "will not apply as

of enactment"), when analyzed in conjunction with the principles illustrated in *Rivers*, indicates

an intent that the amended fee provision be applied retroactively.[2]

Furthermore, equitable grounds similarly favor retroactive application of the amended fee

---

[2]Seeking guidance from legislative history is necessarily an inexact science, and it is not without reservation that this Court relies in part on the statements of Senator Leahy. Of course, Congress more clearly could have shown its intent as to the retroactive application of the statute by incorporating its will onto the face of the statute itself. The absence of such an express provision may indicate that Senator Leahy could not marshal the necessary votes to memorialize his view of the statute's proper application to pending cases. Nevertheless, as the bill's sponsor and chief driving force, Senator Leahy's statements are particularly salient and allow the Court to infer a legislative intent to retroactively apply the amendment to the fee-shifting provision.

13

provision.  Plaintiff patiently waited months for a response from defendant, even though FOIA

requires much more deliberate action.  Ultimately, feeling it had no other choice if it wanted to

obtain the desired information, plaintiff filed suit.  To deprive plaintiff of an award of fees would

be tantamount to ignoring the overarching goals of FOIA and sanctioning defendant's

lackadaisical attitude toward dissemination of government information to the interested public.

This case is certainly not similar to *Martin*, where the Supreme Court cited equitable grounds in

refusing to retroactively apply a new fee provision.  *See Martin*, 527 U.S. at 359-60.  There, had

the Court held otherwise, the plaintiff would have lost a portion of the fees award it had won

almost ten years previously.  *Id.*  This case is fundamentally different in that the question here is

whether to award plaintiff attorney's fees when defendant (i.e. the putative wrongdoer) did not

expect to pay these fees, not whether taking away an award long ago given to a prevailing party

produces an impermissible retroactive effect.

In a final effort to argue against retroactive application of the amended statute, defendant

filed a supplement contending that a recent case from the Western District of Missouri, *Zarcon,

Inc. v. National Labor Relations Board*, informs the analysis of this case.  Though not bound by

the decision in that court, this Court nevertheless finds important differences in the records of the

two actions.  The court in *Zarcon* held that the amendments in the OPEN Government Act do not

apply retroactively to actions pending before its enactment, and therefore the principles

illustrated in *Buckhannon* control disposition of fee disputes in these cases.  (Def. Supp. Ex. 1.)

The Missouri court's decision is rather facile and provides little justification for its conclusion,

aside from various ad hoc assertions.  (*See id.*)  At its core, the opinion argues that it would be

unfair to force the defendant to pay plaintiff's attorney's fees when it was not expecting to do so

while negotiating a settlement agreement disposing of all remaining claims. (*Id.*) However, the

key distinction between that case and the current action is the breadth of the settlements. In

*Zarcon*, the parties resolved a variety of claims while operating under the belief that plaintiff

would not be able to collect attorney's fees absent a court order. (*Id.*) Here, however, the parties

entered into a rudimentary Stipulation, which was restricted to resolving the lone FOIA claim

stemming from plaintiff's initial request. (*See* Stipulation.) Moreover, unlike the agreement in

*Zarcon*, the Stipulation expressly provided that plaintiff retained its right to seek attorney's fees,

and defendant reserved its right to oppose a motion for such an award. (*Id.*) In view of the

foregoing discussion, defendant's reliance on *Zarcon* is inapposite.

### 2.    Waiver of Sovereign Immunity

Defendant's second principal contention rests on the bedrock principle that waivers of

sovereign immunity must be strictly construed in favor of the narrowest possible liability. (*See*

Opp. 11-12.) Defendant argues that since Congress did not express a clear intent to apply the

FOIA amendments retroactively, and since the OPEN Government Act constitutes a waiver of

sovereign immunity, this Court should not apply the terms of the new fee-shifting provision to

this lawsuit, which was commenced three months prior to enactment of the statute. (*See id.*)

This Court finds defendant's arguments unpersuasive, and it concludes that retroactive

application of the OPEN Government Act does not constitute an impermissible waiver of

sovereign immunity.

Courts in the D.C. Circuit must generally strictly construe a waiver of sovereign

immunity. *See, e.g.*, *Trout v. Sec'y of the Navy*, 317 F.3d 286, 289 (D.C. Cir. 2003) (finding that

rule of no interest combined with requirement of strict construction of waivers of sovereign

immunity necessitated rejecting retroactive application of statute at issue). The court in *Trout*,

the case on which defendant principally relies, expressly endorsed the decision in *Brown v.*

*Secretary of the Army*, 78 F.3d 645 (D.C. Cir. 1996), and relied heavily on that court's ruling.

*See Trout*, 317 F.3d at 290-92. The court in *Brown*, in turn, stressed that its ruling did not upset

the decision in *Thompson v. Sawyer*, 678 F.2d 257 (D.C. Cir. 1982), a case in which the court

allowed retroactive application of a statute waiving sovereign immunity, even absent clear

congressional intent. *See Brown*, 78 F.3d at 652.

      The court in *Thompson* addressed a situation with important parallels to this action. In

that case, plaintiffs alleged that the Government Printing Office discriminated against them on

the basis of race. *Thompson*, 678 F.2d at 264. Prior to the disposition of the case, but after some

of the events giving rise to the action had occurred, Congress had amended Title VII to provide

aggrieved plaintiffs with a potential remedy of back pay. *Id.* at 287. Notwithstanding the general

rule requiring strict construction of waivers of sovereign immunity and the absence of clear

congressional intent to the contrary, the court ultimately held that the amendments to Title VII

could permissibly apply retroactively, thereby impacting events which transpired before they

were enacted. *Id.* at 287-88. The court first looked to the goals of Title VII as justification for its

decision not to be bound by the standard presumption in favor of strict construction of waivers of

sovereign immunity, stressing that "Congress amended Title VII because it was deeply concerned

about the poor record of the federal government in ending employment discrimination." *Id.* The

court further emphasized that in an effort to achieve these goals, "Congress provided federal

employees with a new arsenal of remedies - *not rights, but remedies*." *Id.* (emphasis added).

The combination of these salient factors compelled the court to retroactively apply the

16

amendments to Title VII, though traditional canons may have indicated a contrary holding was more appropriate. *Id.*

The D.C. Circuit revisited the *Thompson* decision in a recent case. *See Tomasello v. Rubin*, 167 F.3d 612, 620 (D.C. Cir. 1999) (concluding that retroactive application of compensatory damage and jury trial provisions of Title VII would produce an impermissible retroactive effect). The court rested its decision on findings of a potential impermissible retroactive effect, not on concerns about sovereign immunity: "because the right to a jury trial is tied to the compensatory damages provision and because an award of compensatory damages for preenactment conduct would have an impermissible retroactive effect, we affirm the district court's decision . . . ." *Id.* Nevertheless, the court in dicta interpreted reliance on *Thompson* as requiring evidence of congressional intent if the party wished for the court to retroactively apply the statute in question. *Id.* Finding that the history surrounding the adoption of the relevant section of Title VII "conveys the impression that legislators agreed to disagree about whether and to what extent the Act would apply to preenactment conduct," the court found reliance on *Thompson* inapposite. *Id.* (citations omitted).

In view of the foregoing discussion, this Court is convinced that *Thompson* governs its analysis of this issue and compels retroactive application of the FOIA amendments. The court in *Thompson* stressed that the plaintiffs had the right to be free from discrimination before the Title VII amendments, which was the subject of the underlying claim, and the amendments merely affected possible remedies. *Thompson*, 678 F.2d at 287-89. Owing to this narrow exception, sovereign immunity was not germane to the analysis and retroactive application was therefore permissible. *Id.* This action is strikingly similar to that in *Thompson*. Here, plaintiff had the

17

right to file suit to compel production of certain documents under FOIA, even before enactment

of the OPEN Government Act amendments. *See* 5 U.S.C. § 552 (2002) (amended 2007). The

new fee-shifting provision merely affected possible remedies, not rights. Consequently, even

recognizing the general principle of strict construction of waivers of sovereign immunity, the

FOIA amendments may apply retroactively and govern the disposition of this case.

Though this Court recognizes it is not bound by the D.C. Circuit's dicta in *Tomasello*,

plaintiff's claim would survive even under that method of analysis. There, the court stated that to

qualify for the sovereign-immunity exception articulated in *Thompson*, a statute must evince

clear congressional intent regarding retroactive application, either on its face or in its legislative

history. *Tomasello*, 167 F.3d at 620. The court found the statute at issue failed to meet this

standard, since legislative statements showed a general consensus to "agree[] to disagree" about

retroactivity of the act. *Id.* Here, however, the legislative history surrounding the passage of the

OPEN Government Act highlights Congress's intent to apply the statute retroactively. *See*

discussion *supra* Part II.A.1.

Finally, defendant argues that the D.C. Circuit's decision in *In re Jordan*, 745 F.2d 1574,

1575 (D.C. Cir. 1984), governs disposition of this case. (Opp. 11-12.) Though the preceding

analysis is sufficient to refute defendant's contention, its reliance on this case is further

inapposite. The court in *Jordan* refused to retroactively apply an attorney's-fees provision

allowing for collection of fees from the government. *Jordan*, 745 F.2d at 1575. However, that

case is markedly different from this action in that the amendment at issue added, rather than

merely clarified, a fee-collection provision. *Id.* Consequently, allowing retroactive application

of the amendment would have contradicted Supreme Court precedent requiring explicit statutory

authorization of the possibility of fees awards. *Id.* This issue is not germane to this action, since FOIA has long contained a fee-shifting provision.

### B.    Interpretation of "Substantially Prevailed"

Since this Court has determined that the FOIA amendments contained in the OPEN Government Act should apply retroactively to govern the disposition of this case, the analysis turns to identifying the proper metric with which to evaluate whether plaintiff "substantially prevailed" pursuant to FOIA.

Defendant argues that, even if the OPEN Government Act is applied retroactively to govern disposition of this action, plaintiff still is neither eligible nor entitled to attorney's fees under precedent adopted by this circuit prior to *Buckhannon*. This Court disagrees.

### 1.    Interpretation Under Amended FOIA Statute

The current FOIA statute states simply that "a complainant has substantially prevailed if the complainant has obtained relief through either (I) a judicial order, or an enforceable written agreement or consent decree, or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E). The Supreme Court has held that, "[w]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Dodd v. United States*, 545 U.S. 353, 359 (2005) (internal quotation marks omitted). Under this elementary method of analysis, plaintiff has clearly "substantially prevailed" pursuant to FOIA: it obtained its desired relief, the release of various documents, due to a voluntary change in position by defendant, and its claim was substantial, *see* Part II.B.2, *infra*. Since this is the sole criterion that must be met in order to have "substantially prevailed" under the statute, plaintiff is entitled to attorney's fees.

Though conclusions drawn from this analysis alone afford plaintiff a right to collect attorney's fees, plaintiff is also entitled to fees under the circuit's pre-*Buckhannon* precedent.

### 2.    Interpretation Under the Catalyst Theory

Defendant argues that D.C. Circuit precedent applying the catalyst theory should govern the Court's analysis under the amended FOIA statute. (*See* Opp. 16.) Even under this analysis, however, plaintiff still has a right to an award of attorney's fees.

Prior to *Buckhannon*'s displacement of the catalyst theory as applied to the FOIA statute, D.C. courts in making attorney's-fees determinations were guided by a two-part analysis. *See Burka*, 142 F.3d at 1288. To show that it had substantially prevailed and thus had a right to an award of attorney's fees, a prevailing party had to (1) "establish eligibility by showing that the lawsuit was reasonably necessary and the litigation substantially caused the requested records to be released", and (2) "show that it [was] entitled to fees under four criteria that the court weighs in determining whether attorney's fees are appropriate." *Id.* (internal quotation marks omitted).

### a.    Eligibility

To show that it has substantially prevailed and is eligible for an award of attorney's fees, a FOIA plaintiff must "prove that prosecution of the action could reasonably be regarded as necessary to obtain the information and that a causal nexus exists between that action and the agency's surrender of that information." *Republic of New Afrika*, 645 F. Supp. at 118-19 (citations and internal quotation marks omitted). Though certainly a salient factor, "the mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984). Courts must look to a variety of factors, including the demands of the search, agency backlog of FOIA

requests, and plaintiff's attempts to resolve the issue out of court.  *See id.*

Plaintiff is eligible for attorney's fees under this rubric.  The court in *Weisberg* conceded that the record before it supported the finding that the filing of the suit quickened the response process and forced the defendant to disclose information it might otherwise have refused to offer, even though the court maintained that the causal connection must run deeper than a mere filing of a complaint and subsequent disclosure.  *Weisberg*, 745 F.2d at 1496.  Similarly, the record here indicates that plaintiff may not have received an appropriate response to its FOIA request absent the filing of the lawsuit.  Indeed, defendant had committed to releasing information four separate times, and it had each time reneged without any meaningful explanation.  (*See* Opp. Ex. 1.)  In sharp contrast to its lackadaisical response throughout the previous six months, defendant disclosed the requested documents shortly after this action was commenced by plaintiff.  Such a finding certainly establishes a causal connection between the filing of the complaint and the release of documents.

Moreover, two of the factors highlighted by the court in *Weisberg* similarly compel the conclusion that plaintiff is eligible for an award of attorney's fees.  *See Weisberg*, 745 F.2d at 1496.  Although the court in *Weisberg* mentioned a backlog of FOIA requests as being a relevant factor in assessing agency delay in responding to plaintiff's request, it further emphasized two additional factors: plaintiff's attempts to evade the administrative review process and the time-consuming nature of the search.  *Id.*  Here, unlike the plaintiff in *Weisberg*, plaintiff attempted for six months to solve the dispute out of court and filed this action as a last resort.  (*See* Opp. Ex. 1.)  Furthermore, in stark contrast to the labor-intensive search that yielded 60,000 pages of documents in *Weisberg*, plaintiff's request necessitated discovery of only thirty-five pages of

documents. (Opp. 5-6.) Discussion of the *Weisberg* factors thus further buttresses the conclusion that plaintiff is eligible for attorney's fees under FOIA.

### b.    Entitlement

After concluding a plaintiff is eligible for an award of attorney's fees under FOIA, courts applying the catalyst theory next weigh four factors to determine whether that plaintiff is entitled to the award: (1) "public benefit derived from the case"; (2) "commercial benefit to the plaintiff"; (3) "nature of the plaintiff's interest in the records"; and (4) "whether the Government had a reasonable basis for withholding requested information." *Burka*, 142 F.3d at 1288. Each factor contributes to the conclusion that plaintiff is entitled to an award of attorney's fees.

Courts have held that a plaintiff meets the public-benefit standard "where the complainant's victory is likely to add to the fund of information that citizens may use in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995). Plaintiff's attempts at identifying the precise connection between three high-ranking elected officials and a real estate developer surely would aid individuals in making a most "vital political choice[]," whether to cast votes for these officials' reelection. Indeed, there has been growing public interest in the officials' alleged involvement in the transactions involving this land. (*See* Pl. Mot. Ex. 2.)

The next two factors, which include commercial benefit to the plaintiff and plaintiff's interest in the records, are "closely related and often considered together." *Cotton*, 63 F.3d at 1120. Courts have posited that "[w]hen a litigant seeks disclosure for a commercial benefit or other personal interest, an award of fees is usually inappropriate." *See, e.g.*, *id.* Here, plaintiff's sole goal in obtaining the requested records was to investigate potential official misconduct. (*See*

22

Pl. Mot. 8-9.)  Since plaintiff is a non-profit organization, it maintained  no commercial interest in submitting this FOIA request.  (*See id.*)  Furthermore, plaintiff's attempts to uncover information regarding a potential sordid connection between elected officials and a land developer meshes with FOIA's chief goal of promoting transparency and accountability in government.  *See* Part I.B.1, *supra*.

The final factor, which involves the reasonableness of government inaction, is "intended to weed out those cases in which the government was recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior."  *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1097 (D.C. Cir. 1992) (internal quotation marks omitted).  Courts have generally required that defendants, at a minimum, provide meaningful justification for inactivity or refusal to turn over requested information.  *See, e.g.*, *Cotton*, 63 F.3d at 1121 (concluding defendant was reasonable in its withholding of records because it asserted plausible legal claim in response to plaintiff's request); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, No. 03-195, 2006 WL 508332 at *5 (D.D.C. March 1, 2006) (emphasizing that defendant's "demonstra[tion] that it had a reasonable legal basis for claiming exemption" contributed to conclusion that its actions were not unreasonable); *Horsehead Indus., Inc. v. U.S. E.P.A.*, 999 F. Supp. 59, 66 (D.D.C. 1998) (finding defendant was not unreasonable in failing to disclose a number of documents when it informed plaintiff of its decision and used solid legal position as justification).  Defendant's justifications for its inaction fall short of meaningful.  It continually assured plaintiff that its request would soon be released, only to subsequently renege on these commitments, citing as justification sweeping assertions that it was "short-staffed" and saddled with other FOIA requests demanding immediate attention.  (*See* Opp. Ex. 1.)

23

Moreover, defendant's persistent delays in responding are all the more unreasonable in view of the revised FOIA statute.  Congress made clear that lack of government responsiveness would not be tolerated under the new FOIA regime: "[the] OPEN Government Act will help to reverse the troubling trends of excessive delays and lax FOIA compliance in our government and help to restore the public's trust in their government."  153 CONG. REC. S15701-04 (Dec. 14, 2007) (statement of Sen. Leahy); *see also id.* (statement of Rep. Smith) ("[T]he process for obtaining information is overly burdensome and Federal agencies have become less and less responsive to requests for information . . . [t]axpayers should have the opportunity to obtain information from the Federal Government quickly and easily.").  To this end, Congress intended to "restor[e] meaningful deadlines for agency action under FOIA."  *Id.* (statement of Sen. Leahy).  Defendant's inaction constituted precisely the lack of response that Congress endeavored to eliminate in passing the OPEN Government Act.  Defendant provided to plaintiff four separate anticipated dates of release, only to let the dates pass without providing meaningful justification for the delays.  (*See* Opp. Ex. 1.)

In an effort to escape this conclusion, defendant argues that its failure to meet deadlines does not alone constitute unreasonableness.  (*See id.* at 20 (relying on *Simon v. United States*, 587 F. Supp. 1029, 1032-33 (D.D.C. 1984) for this proposition).)  The court in *Simon* justified this conclusion by pointing to the then-current FOIA statute's legislative history, which "clearly reveal[ed] that the fee provision was designed for limited purposes."  *Simon*, 587 F. Supp. at 1032-33.  Defendant's reliance on the principle articulated by the *Simon* court is therefore misplaced, since the current FOIA statute's legislative history evinces a strong desire for courts to be aggressive in awarding attorney's fees to prevailing parties.  *See* discussion *supra* Part

24

II.A.1.

###    C.     Calculation of Fees Award

D.C. courts recognize that the "usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount." *Bd. of Trs. of Hotel and Rest. Employees Local 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998). Moreover, "a party whose attorney charges a discounted rate for public-spirited reasons may nevertheless receive an award of fees at market rates." *Id.* Such public-spirited reasons extend primarily to "fee-shifting provisions that have . . . citizen-enforcement purpose[s]." *Id.* The statutory framework of FOIA rests on citizen demand of information from government agencies, so plaintiff counsel's work qualifies as "public-spirited." *See* 5 U.S.C. § 552.

Courts use the *Laffey* matrix to determine reasonable hourly rates in calculating an appropriate award of attorney's fees. *See, e.g.*, *Univ. Legal Serv. Prot. and Advocacy, Inc. v. Knisley*, No. 04-1021, 2006 WL 3623695 at *6 (D.D.C. Dec. 11, 2006). The *Laffey* matrix is "a schedule of charges based on years of experience developed in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983). Using the 2003-2008 *Laffey* matrix to determine the appropriate "lodestar" amount, this Court finds that plaintiff is entitled to $3,237.75 for attorney's fees expended in this litigation. (*See* Pl. Mot. Ex. 3 & 4.) Additionally, plaintiff is entitled to $367.82 to compensate for other litigation expenses. (*See* Pl. Mot. Ex. 4.) Totaling these two amounts, plaintiff has a right to an award of $3,605.57.[3]

---

[3]Defendant does not contest the validity of plaintiff's calculation of an appropriate award of attorney's fees and litigation expenses.

## III.  __CONCLUSION__

For the foregoing reasons, the Court concludes that plaintiff's Verified Motion for an Award of Attorney's Fees and Litigation Expenses will be GRANTED.

A separate order shall issue this date.


Signed by Chief Judge Royce C. Lamberth, on June 27, 2008.